975 A.2d 941 (2009)
408 N.J. Super. 540
Application for PROJECT AUTHORIZATION UNDER the NEW JERSEY REGISTER OF HISTORIC PLACES ACT, Sears, Roebuck and Co. Retail Department Store, Gateway Office Park Project, Camden, New Jersey.
DOCKET NO. A-6494-06T1.
Superior Court of New Jersey, Appellate Division.
Submitted June 1, 2009.
Decided July 30, 2009.
*943 Maley & Associates, for appellants Ilan Zaken, Dr. Denim, Inc. and Miskeen Originals, L.L.C. (M. James Maley, Jr., Erin Simone and Joseph F. Kunicki, on the briefs).
Anne Milgram, Attorney General, for respondent New Jersey Department of Environmental Protection (Helene P. Chudzik, Senior Deputy Attorney General, on the statement in lieu of brief).
Blank Rome, L.L.P., Philadelphia, PA and Parker McCay, P.A., Marlton, for respondents Campbell Soup and Camden Redevelopment Authority (Stephen M. Orlofsky, Philadelphia, PA, Kit Applegate, Anthony Merlino and Gene R. Mariano, Marlton, on the brief).
Before Judges CARCHMAN, SABATINO and SIMONELLI.
The opinion of the court was delivered by
SIMONELLI, J.A.D.
Respondent New Jersey Department of Environmental Protection (DEP) granted the application of respondent Camden Redevelopment Agency (CRA) to acquire and demolish the Sears, Roebuck and Company Retail Department Store (Sears building), located at 1300 Admiral Wilson Boulevard in Camden (Sears property).[1] The CRA and respondent Campbell Soup Company (Campbell Soup) initially sought approval to acquire the Sears property and to demolish the Sears building as part of a proposed amendment to the Gateway Redevelopment Plan (Gateway plan), adopted by the City of Camden (City) in 2006. The Gateway plan's purpose was to revitalize businesses, institutions, and housing, and to create new development opportunities in the area known as the "Gateway Redevelopment Area" (Gateway area).
Appellants Ilan Zaken (Zaken), Miskeen Originals, L.L.C. (Miskeen Originals), and Dr. Denim, Inc. (Dr. Denim),[2] who claim an interest in the Sears property, challenge the DEP's decision, contending that: (1) the CRA lacked standing to apply for and receive demolition authorization for the Sears building; and (2) DEP's grant of the application was arbitrary, capricious and unreasonable, and unsupported by the record. Appellants argue that the CRA failed to establish that demolition of the Sears building would result in a public benefit, and that there were no feasible or prudent alternatives to the demolition. We affirm.
The following facts are pertinent to our review. The Gateway area traditionally served as a transitional neighborhood and industrial hub but underwent a decline during the late twentieth century. It consists primarily of vacant and under-utilized land, and deteriorated and abandoned properties. It is bounded by Interstate 676 on the south and west, by the Admiral Wilson Boulevard (U.S. Route 30) on the north, and by the Cooper River on the *944 east. In June 2003, the City adopted the Gateway Determination of Need Study, which identified the Gateway area as an area in need of redevelopment.
The Gateway area includes the Sears property, which encompasses approximately four acres. The Sears building located on the property was constructed in 1927, with an addition to the rear constructed in 1947. The two-story, 125,000-square-foot building served as a Sears retail department store until the store closed in 1971. After that a variety of commercial and non-commercial tenants occupied the building. It apparently became unoccupied in January 2007.
In May 2000, the Sears building was placed on the New Jersey Register of Historic Places for its commercial "Classical Revival" architecture and its design by George C. Nimmons and Company, a renowned commercial architectural firm. In addition to architecture, this historic building was deemed significant in the areas of commerce, community planning and development, and social history. The building was also placed on the National Register of Historic Places under two criteria:
A. Property is associated with events that have made a significant contribution to the broad patterns of our history.
....
C. Property embodies the distinctive characteristics of a type, period, or method of construction or represents the work of a master, or possesses high artistic values, or represents a significant and distinguishable entity whose components lack individual distinction.[3]
In 2006, the City adopted the Gateway plan, which did not identify the Sears property as a property to be acquired or a property that may be acquired.
On May 16, 2006, Zaken entered into an agreement of sale to purchase the Sears property for $2,750,000. He planned to use the Sears building for appellants' manufacturing and distribution operations, for office and warehouse space, and for a retail store and recording studio. However, the transfer of title did not occur, and on January 8, 2007, appellants filed a complaint in the Superior Court, Camden County, seeking specific performance.
On February 6, 2007, the CRA, the redevelopment agency responsible for the acquisition and disposition of properties; the City; the County of Camden (County); and the New Jersey Economic Development Authority (EDA), the coordinating state agency for the project, entered into a Project Development Agreement (PDA) to induce Campbell Soup to expand its existing facilities in Camden and to actively participate in the development of an office park in the Gateway area.
The PDA also acknowledged that Campbell Soup had been located in Camden since that company's inception in 1869, and that the company was the sole Fortune 500 company with headquarters in Camden. The PDA further acknowledged that retention and expansion of Campbell Soup's world headquarters in Camden would accomplish a major public benefit, stating that the company was a major employer in the region with more than 1200 employees and "hundreds of additional jobs in the city for outside contractors and their employees."
As part of its involvement, Campbell Soup agreed to make site improvements, to rehabilitate structures on its campus located directly south of the office park area, and to construct a new two-story, 80,000-square-foot office building. Campbell *945 Soup also agreed to invest $72 million, including $58.5 million for construction of the new building, and $13.5 million for rehabilitation of its existing structures. According to an EDA news release, Campbell Soup would use approximately 40 acres of the proposed 110-acre office park.
The PDA acknowledged that the Sears building was an impediment to the development of a quality office park. Campbell Soup, therefore, proposed to contribute $2.9 million to the CRA to acquire the Sears property and to demolish the Sears building.
Campbell Soup further agreed to act as master redeveloper of the office park and to use its own resources to attract other corporate clients to move there. The City, County, and State also made financial commitments to invest approximately $23 million to improve or create the area's infrastructure. The day after the parties signed the PDA, Governor Corzine was quoted in a news release as saying:
This deal demonstrates the importance and the benefits of public-private partnerships in helping our communities thrive.... Stimulating economic growth is vital to our ongoing efforts to revitalize Camden, and this collaboration between Campbell and state, county, and local government represents an important sign of renewal for the city.
Sometime after executing the PDA, the CRA and Campbell Soup sought an amendment of the Gateway plan from the City of Camden Planning Board (Planning Board). The amendment added the Sears property to the project. At a public hearing on April 18, 2007, the Planning Board recommended that the City adopt the amendment.
The CRA and Campbell Soup also sought approval from the City of Camden Historic Preservation Commission (Camden HPC) for a Certificate of Appropriateness to demolish the Sears building. After two public hearings, the Camden HPC recommended that the Planning Board deny the certificate. The Planning Board declined to follow that recommendation and, instead, adopted a resolution granting the certificate.
The CRA obtained several expert reports, including an existing conditions assessment report by S. Harris & Co., dated May 15, 2007, which recognized the financial aspects that must be considered when recommending alternative uses for the Sears building. The report stated that:
The overall condition of the building's structure is stable and sound. There are localized areas of distress and structural instability, but these issues can be corrected. The 1947 building campaign at the west end of the building is a lesser quality construction, but it also does not pose a structural concern. The greatest concerns within the building are hazardous materials and the severe mold growth that has been fostered and now infests all of the walls, floors, and ceiling tiles within the structure. Related to the mold is the deterioration of the roofing materials through which water has penetrated the interiors and helped spawn the mold colonies. Poor maintenance and the inefficiency of existing systems has also aided in the degradation of the interior environment.
This building can be reused, but the costs involved in redeveloping the site may make it unrealistic to do so. Due to the extensive remediation required, the interior demolition, and remaining usable square footage, the building may no longer provide the city a useful and marketable property. By going through several alternative scenarios of reuse, we have come to the conclusion that any attempt at reuse of the entire building would make the site very difficult to *946 market and to efficiently get the best value for the property as a whole. If the economic environment were different, we might in fact advocate that full rehabilitation of the entire building could provide an average return on investment, but this is not the case.
An alternative analysis report by S. Harris & Co. explored five options involving total or partial rehabilitation or demolition of the Sears building. The report concluded that all the options were "technically and physically feasible," but that rehabilitation was not financially viable.
A feasibility assessment report by Urban Partners analyzed the economic feasibility of the five proposed alternatives to demolition. After evaluating development costs, available financing, tax credits, and the alternative projects' economics, the report concluded that the financing gaps were too large for them to be financially feasible with one exception. It concluded that demolition of the Sears building to create a cleared site for construction of a three-story, 175,000-square-foot office building was the only financially feasible option.
Relying on its experts' findings, the CRA determined that rehabilitation of the Sears building required the removal of hazardous materials including mold, asbestos, and lead-based paint, the replacement of roofs, and the installation of new drainage, mechanical, plumbing, electrical, and fire suppression systems. The building's rehabilitation also had to address several areas of settlement, major displacement and cracking of exterior headers and columns, severe rust stains emanating from corroded metal floor decks, and structural deficiencies. Moreover, the CRA concluded that "[t]he building's sheer volume dominates the adjacent roadway and severely limits the effective redevelopment of the Gateway area into a Class A office park."
The CRA, therefore, submitted to the DEP's Historic Preservation Office an Application For Project Authorization Under the New Jersey Register of Historic Places Act, N.J.S.A. 13:1B-15.128 to -15.132 (Historic Places Act or Act). The CRA sought approval to acquire the Sears property, to demolish the Sears building, and to construct a 175,000-square-foot office building on the property. It considered removal of the Sears building "an unfortunate consequence of the Project in order to permit a broad array of site improvements to be undertaken, including street, parking, and aesthetic improvements, which will facilitate optimal site flexibility and access, and create conditions conducive to attracting a variety of potential purchasers, private developers, and tenants." However, without the building's demolition, the application concluded that Campbell Soup would "no longer view the Area or Camden as a viable location for its corporate headquarters or other operations." To mitigate the adverse effects of demolishing the Sears building, the CRA proposed to document it to the standards of the Historic American Buildings Survey, to employ three-dimensional scanning technology to record the facade and other building elements, and to create an educational museum exhibit.
On June 21, 2007, the State Historic Sites Council (HSC) held a public hearing to determine whether to grant authorization to demolish the Sears building. Several witnesses testified about the building's deteriorated condition, the cost of rehabilitation, the lack of economically feasible alternatives to its removal, the absence of a viable reuse option, the building's location on the site, and the project's public benefits. For example, James Hartling of Urban Partners estimated the total cost of rehabilitation at $28.1 million, including professional fees, insurance and construction *947 interest. He noted that the cost to remove the mold, asbestos, and an underground storage tank alone was $1.6 million. Brian Feury of Langan Engineering, who addressed air quality issues, also estimated that the cost to remove these hazardous materials at $1.6 million.
Hartling also testified about the five alternatives to demolishing the Sears building. While acknowledging that there were "thousands of [other alternatives]," he believed that these five touched on the range of possibilities. He noted that it was common practice to rely on architects to determine which ones were feasible. He said the alternatives were not economically feasible given the estimated costs of rehabilitating the Sears building to Class A office space to maximize rents, the estimated costs of environmental remediation, and the market conditions for offices in the area.
Hartling concluded that the alternatives of rehabilitation or retention would "drive the cost up and lower the likely financing to a point that it is unlikely that you would be able to find through the normal range of economic incentives available by the State, the CRDA, or the City, enough funds to bridge that gap."
Hartling also concluded that Zaken's proposal to rehabilitate the Sears building for use as warehouse, office retail, and light manufacturing space at a cost of $1 million was not realistic. In addition to environmental remediation and roof replacement, the building needed bathrooms, heat, electrical power, and exterior improvements.
Richard Farley, Campbell Soup's architect, explained that the Sears building could not be turned into "Class A"[4] office space and, along with Hartling, expressed concern that its location at the front of the proposed office park would block and hinder development.
Robert Shober, Campbell Soup's director of infrastructure and environmental engineering, spoke about the "deplorable condition" of the roof on the Sears building, and estimated its replacement cost at between $900,000 and $1 million. Robert Zane of Campbell Soup also said that Campbell Soup would not continue with the project if the Sears building remained on the site.
James Harveson, the CRA's economic development director, expressed concern about the Sears building's deteriorated condition, and believed its continued presence jeopardized the ultimate success of the new office park. Harveson also testified about the importance of Campbell Soup's continued presence in Camden, and about its commitment to invest $73 million in the project, along with other benefits.
Harveson further testified about the project's public benefits, especially the importance of creating a new office campus at the entrance to Camden. He explained that:
[I]t is a textbook example of the kind of public private partnership that makes an urban redevelopment project work. We have the elements here of all that. We have a company with substantial means, with clout, with a wonderful reputation. We have  we have minimized the risk to the public sector. We have full cooperation of various levels of the State, Local and County Government here.
We have a player that was asked  Campbell's was asked to be the master developer in the Gateway area and they agreed to bring their clout and their *948 influence in the market to attract new tenants to the area and new developers that wouldn't necessarily take the risk of going into this area, but there they are as the anchor and they're setting the tone for the redevelopment.
Harveson also described other public benefits as additional security, landscaping, creation of a new gateway into Camden, improvements to the street network, ability to raise money for infrastructure, and significant increases in taxes.
Caren Franzini, the EDA's chief executive officer, described five public benefits that would flow from the project: (1) the retention and expansion of Campbell Soup in Camden; (2) the continued investment by Campbell Soup Foundation in local non-profit groups; (3) Campbell Soup's agreement to market Camden and the Gateway area; (4) increased tax revenues; and (5) the cooperation between a major corporation and government to redevelop Camden.
John Kromer, a senior consultant at the Fels Institute of Government at the University of Pennsylvania, who was under contract to serve as the CRA's executive director, described the Gateway area as a difficult site "bordered by high speed auto traffic, a railroad overpass, an overpass for another high speed highway and a river." Nonetheless, he believed the project had the potential to attract reinvestment in Camden by offering security and parking, and to attract employees who would move into Camden. Kromer also believed the public would benefit from retaining a Fortune 500 company, such as Campbell Soup, in the city and keeping that company identified with Camden.
Kromer also testified that during the five years since passage of the Municipal Rehabilitation and Economic State Recovery Act, N.J.S.A. 52:27BBB-1 to -79, in 2002, he was unaware of any other proposals for the Sears building or the larger area in which Campbell Soup was located. He observed that the absence of proposals came after an aggressive marketing effort involving interagency coordination and a level of funding that was unlikely to be duplicated. Kromer believed one reason for the lack of interest was the fact that the area was not a true gateway into the City, and was not a place that encouraged people to stop and visit. He also said Zaken's proposal to rehabilitate the Sears building was not feasible because the investment was too low, and studies did not support the proposal in terms of the relationship between the project costs and proposed reuse.
The HSC also heard extensive public comments, with the majority expressing support for the project, citing its potential to assist in the city's economic development and the importance of retaining Campbell Soup in Camden. Those in opposition emphasized the Sears building's historical and commercial significance, they challenged the economic feasibility studies, they disputed the extent of the building's deterioration, and they expressed concern that the EDA had a "presupposed outcome" by identifying this building in the PDA as an impediment to the project.
Additionally, appellants testified about their interest in preserving and rehabilitating the Sears building. Among other things, they or their representatives said that they owned the Sears property, that they proposed to spend $1 million on repairs to the Sears building and $200,000 on roof replacement, that they planned to move their business operations into the building, and that they had other investors who were ready to move into Camden. They disclosed the legal dispute over their contract to purchase the property.
Following the hearing, the HSC adopted a resolution recommending denial of the *949 application. It concluded that the CRA and the EDA did not adequately consider whether there were "feasible and prudent alternatives" to the encroachment, such as the rehabilitation of "all or at least the earliest section of the building[.]" For example, it found that the alternatives did not explore the possibility of rehabilitating the Sears building for uses other than Class A offices.
Assistant DEP Commissioner Amy Cradic reviewed the record and considered the project's public benefit. She also considered whether there were feasible and prudent alternatives to demolition, and whether sufficient measures could be taken to avoid, reduce, or mitigate the impact on the Sears building.
On July 19, 2007, Cradic approved the application with certain conditions. She concluded that "significant financing gaps" rendered all alternatives to demolition infeasible, and that the CRA demonstrated the public benefits of the office park, such as the retention and creation of jobs, the introduction of new businesses, and the proposed upgrades to water and sewer lines, sidewalks, and lighting. She also concluded that sufficient measures could be taken to mitigate the impact of demolition, including: (1) documentation of the structure to HABS standards; (2) salvage of significant architectural details; (3) creation of an interpretative exhibit on its history; (4) erection of a permanent memorial on the site; and (5) preparation of a marketing survey to identify redevelopment potential for reusing historic buildings in the core historic commercial areas of downtown Camden.
On August 20, 2007, appellants filed a notice of appeal. On October 15, 2007, title to the Sears property transferred from Camden Gateway, L.L.C., to Zaken's corporate nominee, Camden Gateway Properties I, L.L.C., for $2.75 million.
On January 23, 2008, in an unrelated civil action,[5] the court found invalid the Planning Board's April 18, 2007 recommendation that the City adopt the amendment to the Gateway plan. This effectively meant that the Sears property was no longer on the list of properties to be acquired for the project.
In February 2008, Campbell Soup announced its decision to proceed with the office park project without demolishing the Sears building. It also decided not to appeal the court's decision voiding the Planning Board's April 18, 2007 recommendation.
On March 14, 2008, Campbell Soup, the CRA, the City, the County, and the EDA amended the PDA. This amendment stated that:
As a result of certain circumstances, it has been determined by the parties hereto that [the Sears property and building] might not be acquired and demolished, which may in turn impede the ability of [Campbell Soup] in achieving the original goals with respect to the Sears redevelopment and the surrounding area.
On May 6, 2008, the CRA advised that it would not seek an extension of the certificate of appropriateness for demolition of the Sears building. The certificate expired on or about June 8, 2008. Appellants then asked the CRA to withdraw the application for project authorization. The CRA declined to do so.
On July 28, 2008, the CRA and Campbell Soup entered a master redevelopment agreement for the office park project. This agreement identified the Sears property as part of the "property" description *950 but stated that it may not be acquired by either the CRA or by Campbell Soup. If such an acquisition occurred, however, the agreement provided that the CRA would be involved in the transfer of title to the extent required by the PDA, and that Campbell Soup and the CRA would mutually agree on what funds Campbell Soup must contribute for the cost of the acquisition.
In light of the court's decision in Standard Merchandising, and Campbell Soup's decision to stay in Camden and proceed with the project without demolishing the Sears building, on July 29, 2008, appellants asked the DEP to reconsider its approval of the application, citing three reasons: (1) the Sears property was under new ownership and the Sears building was being renovated for use as retail, office, and warehouse space; (2) the public benefit of the office park project would be realized without the building's demolition; and (3) the court had invalidated the CRA's legal basis for acquiring the Sears property. Among other things, appellants claimed that Campbell Soup had subsequently applied for and received site plan and subdivision approvals for construction of its new headquarters, which did not require the Sears building's demolition; and that the CRA had no legal authority to acquire the Sears property by eminent domain as it was not included on the "to be acquired list" in the Gateway plan. In its response, the DEP stated that it had made a "project-specific determination with specific conditions," and would not revisit its decision.

I.
Appellants first contend that the CRA lacked standing to apply for, or receive from the DEP, authorization to demolish the Sears building pursuant to N.J.S.A. 13:1B-15.131 because it did not own or control the Sears property, and did not have appellants' permission to demolish the building. Appellants also contend that the CRA could not acquire the Sears property by eminent domain because it was not listed on any redevelopment plan as a property "to be acquired."
"The issue of standing is a matter of law," to which we must exercise de novo review. People for Open Gov't v. Roberts, 397 N.J.Super. 502, 508, 938 A.2d 158 (App.Div.2008). We are not bound by an agency's interpretation of a statute or resolution of a question of law. In re Taylor, 158 N.J. 644, 657-58, 731 A.2d 35 (1999). With this standard in mind, we continue our analysis.
New Jersey courts take a liberal approach to standing. N.J. Citizen Action v. Riviera Motel Corp., 296 N.J.Super. 402, 415, 686 A.2d 1265 (App.Div.), certif. granted, 152 N.J. 13, 702 A.2d 352 (1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998); Hoboken Environment Committee, Inc. v. German Seaman's Mission of N.Y., 161 N.J.Super. 256, 263, 391 A.2d 577 (Ch.Div.1978). To have standing to maintain an action before the court, a party must have a sufficient stake in the outcome, a real adverseness with respect to the subject matter, and a substantial likelihood of some harm if the decision is unfavorable. In re Camden County, 170 N.J. 439, 449, 790 A.2d 158 (2002); see Hoboken Environment Committee, Inc., supra, 161 N.J.Super. at 263-67, 391 A.2d 577 (holding a group of residents and taxpayers, and committee dedicated to preserving the city's historic sites, had standing to bring suit where there was substantial public interest and demolition would have significant impact on State and local efforts to preserve historical areas). Moreover, "when an agency enforces its regulations against a respondent or considers an application for *951 benefits, the respondent and applicant clearly have standing." In re Camden County, supra, 170 N.J. at 449, 790 A.2d 158 (quoting New Jersey Practice, Administrative Law and Practice § 7.4, at 360 (Steven L. Lefelt, et al.) (2d ed. 2000)) (holding county had standing in administrative hearing to contest disability pension award).
The Historic Places Act provides for the designation of "areas, sites, structures and objects within the State determined to have significant historical, archeological, architectural or cultural value." N.J.S.A. 13:1B-15.128. While the Act does not specify who may enforce the law, it sets forth certain limitations on the use of historic properties. Hoboken Environment Committee, supra, 161 N.J.Super. at 262, 391 A.2d 577. N.J.S.A. 13:1B-15.131 prohibits
[t]he State, a county, municipality or an agency or instrumentality of any thereof... [from] undertak[ing] any project which will encroach upon, damage or destroy any area, site, structure or object included in the Register of Historic Places without application to, and the prior written authorization or consent of, the Commissioner of Environmental Protection.
Here, the CRA sought the DEP's approval to acquire the Sears property and to demolish the Sears building by submitting an appropriate application for project authorization. As described by Harveson, the CRA was in charge of redevelopment projects in Camden, including "the acquisition and disposition of properties for development purposes." Moreover, the City designated the CRA to implement the Gateway plan. Therefore, as the redevelopment agency for the City, the CRA was statutorily mandated to obtain the DEP's approval before encroaching on the Sears building. N.J.S.A. 13:1B-15.131. Likewise, the EDA, the coordinating state agency for this project, was required by law to seek the DEP's consent to demolish the Sears building.
Neither the Act, nor the New Jersey Register of Historic Places Rules, N.J.A.C. 7:4-1.1 to -8.9 (Rules), require a public entity to own or control historic property before seeking encroachment authorization. To the contrary, the Rules require an applicant to begin the encroachment authorization process "[d]uring the earliest stage of planning for any undertaking and before taking any action that could result in a physical effect on a property listed in the New Jersey Register[.]" N.J.A.C. 7:4-7.1(a). When the applicant identifies a registered property in the area of an undertaking's potential impact, the Rules require the submission of an application, which, among other things, must include "[a] complete list of owners of registered properties that would be directly affected by the undertaking." N.J.A.C. 7:4-7.1(d)(6). This list must include all private and public owners as of the date of submission of the application. Ibid.
If the DEP Commissioner determines that an undertaking constitutes an encroachment, or will damage or destroy historic property, the Rules require that, within fifteen days of receipt of such notice, the applicant must provide "written notice to owners of registered properties... that an application has been submitted to the Commissioner for authorization and has been determined to constitute an encroachment." N.J.A.C. 7:4-7.2(e)(2). The notice must contain a statement indicating that any person directly affected by the undertaking may request in writing that the Commissioner ask the HSC to conduct a special public meeting on the encroachment application. N.J.A.C. 7:4-7.2(e)(3). Thus, the Act and Rules do not require an applicant to own or control a State Register-listed property prior to seeking project *952 authorization pursuant to N.J.S.A. 13:1B-15.131.
Similarly, the Act does not require a public entity to acquire historic property by eminent domain before submitting an application for project authorization. N.J.S.A. 13:1B-15.131; see N.J.A.C. 7:4-7.2. To the contrary, a party seeking "to develop or otherwise affect" a property listed on the State Register may not do so without the DEP's permission. Patterson v. Vernon Twp. Council, 386 N.J.Super. 329, 335, 901 A.2d 411 (App.Div.2006).
Here, the Gateway plan authorized the CRA to acquire, by condemnation, any buildings or land necessary for redevelopment pursuant to the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, and anticipated amendments that might materially affect an owner with an interest in the redevelopment area. The CRA properly followed the application procedure for projects encroaching upon the Sears building, a State Register-listed property. We agree with Campbell Soup and the CRA that this process makes "considerable practical sense" as it would waste time and taxpayer funds for public entities to engage in the lengthy and costly process of purchasing or condemning historic sites only to later have the DEP deny authorization to implement such plans. Accordingly, we conclude that the CRA had standing to apply for, and to receive authorization from, the DEP to demolish the Sears building pursuant to N.J.S.A. 13:1B-15.131.

II.
Appellants next contend that the DEP acted arbitrarily, capriciously, and unreasonably in granting the application for project authorization. Specifically, appellants claim that the CRA failed to establish the public benefit of demolition, and the lack of any feasible alternatives to the building's demolition. We disagree.
Our review of a final administrative agency decision is limited. In re Herrmann, 192 N.J. 19, 27, 926 A.2d 350 (2007). We will not reverse an agency's decision unless it is arbitrary, capricious, or unreasonable, or lacks fair support in the record. Id. at 27-28, 926 A.2d 350; Beattystown Cmty. Council v. Dep't of Envtl. Prot., 313 N.J.Super. 236, 248, 712 A.2d 1170 (App.Div.1998). The function of our review is to determine whether the agency decision violates legislative policies, lacks the support of substantial evidence in the record, and unreasonably applies legislative policies to the relevant facts. Herrmann, supra, 192 N.J. at 28, 926 A.2d 350. If the agency meets these criteria, we owe substantial deference to its expertise and superior knowledge in a particular field, and to its interpretation of its own regulations. Ibid.; H.K. v. Div. of Med. Assistance & Health Servs., 379 N.J.Super. 321, 327, 878 A.2d 16 (App.Div.), certif. denied, 185 N.J. 393, 886 A.2d 663 (2005).

A. Public Benefit

Appellants first contend that the CRA failed to establish the public benefit of the proposed demolition of the Sears building. They argue that Campbell Soup's subsequent decision to proceed with the project, without the Sears property and the demolition, refuted claims that the building's removal was necessary for the project to proceed, and for Campbell Soup to remain in Camden. However, appellants' contention is premised on their misunderstanding of the meaning of the term "project."
The Rules define a "project" as a planned undertaking. N.J.A.C. 7:4-1.3. "Undertaking" is defined as "an action by the State, a county, municipality, or an agency or instrumentality thereof, which *953 has the potential to result in direct or indirect effects on any district, site, building, structure or object listed in the New Jersey Register." Ibid. Because the Sears building is listed in the New Jersey Register and is in the "area of the undertaking's potential impact," the CRA was required to submit the application. N.J.A.C. 7:4-7.1(c).
After determining that an application is technically and professionally complete and sufficient, N.J.A.C. 7:4-7.2(a), the DEP must determine whether the undertaking "constitutes an encroachment, or will damage or destroy the historic property[.]" N.J.A.C. 7:4-7.2(c)1. "Encroachment" means "the adverse effect upon any district, site, building, structure or object included in the New Jersey Register resulting from the undertaking of a project by the State, a county, municipality or an agency[.]" N.J.A.C. 7:4-1.3.
The "undertaking" here was to redevelop a portion of the Gateway area as an office park and to expand Campbell Soup's headquarters. The authority to demolish the Sears building was part of this undertaking. Thus, the undertaking would result in an encroachment on a building listed in the New Jersey Register.
The Rules next required the DEP, upon request or on its own initiative, to schedule a public meeting with the HSC to review the application. N.J.A.C. 7:4-7.2(e). The HSC must evaluate the encroachment using the criteria set forth in N.J.A.C. 7:4-7.4, the Secretary of the Interior's Standards for the Treatment of Historic Properties ("Secretary's Standards"), and the "Guidelines for Preserving, Rehabilitating, Restoring, and Reconstructing Historic Buildings," issued by the National Park Service. N.J.A.C. 7:4-7.2(e)(6) (citing in part 36 C.F.R. 68); Beattystown, supra, 313 N.J.Super. at 242, 712 A.2d 1170. The HSC also must consider the following criteria:
[1] The public benefit of the proposed undertaking;
[2] Whether or not feasible and prudent alternatives to the encroachment exist, and
[3] Whether or not sufficient measures could be taken to avoid, reduce or mitigate the encroachment.
[Beattystown, supra, 313 N.J.Super. at 242, 712 A.2d 1170 (citing N.J.A.C. 7:4-7.2(e)6).[6]]
The HSC must submit its written recommendations to the DEP Commissioner, who then can authorize or consent to the encroachment, authorize or consent to the encroachment with conditions, or deny the application. N.J.A.C. 7:4-7.2(e)7 and 9.
Assistant Commissioner Cradic reviewed the record in light of the three criteria, and determined that they were met. Regarding the public benefit of this "urban economic redevelopment project," she found that:
The [CRA] demonstrated the public benefits of this project, including the retention of 1,200 direct jobs and additional indirect jobs through the expansion of Campbell Soup's International Headquarters. The development of the Gateway Office Park will attract businesses and provide long-term, additional tax revenues for the City of Camden that will help support its sustainable future. In addition, as part of the redevelopment, upgrades will be made to the City's water and sewer lines, and area streets, sidewalks and lighting will either *954 be rehabilitated or removed, improving public safety.
In Beattystown, supra, 313 N.J.Super. at 239, 712 A.2d 1170, we reviewed a similar decision by the DEP in connection with an application for project authorization to build a shopping center that required road improvements within the Beattystown Historic District. After two public hearings, the HSC returned the record to the Assistant Commissioner for final decision. Id. at 239-40, 712 A.2d 1170. Among other things, the Assistant Commissioner found that the public benefit of the proposed undertaking was related to the need to make traffic safety improvements within the public right-of-way, and that the improvements were necessary to avoid creating an unsafe condition as a result of added traffic from the shopping plaza. Id. at 244, 712 A.2d 1170. We concluded "that this presumptively reasonable decision comports with the statutory mandate and regulatory directions to the DEP, leaving no warrant for our intervention." Ibid.
Based upon our careful review of the record, we are satisfied that there is ample evidence supporting Assistant Commissioner Cradic's conclusion that the CRA met the "public benefit" requirement for granting project authorization. The record indicates, among other things, that the proposed office park and the expansion of Campbell Soup's headquarters would create jobs, increase the City's tax revenues, and improve public safety. Because the DEP followed N.J.A.C. 7:4-2(e)(6), and its decision is fully supported by the record, we defer to the agency's expertise, knowledge, and interpretation of its own regulations.
We also reject appellants' argument that the CRA failed to demonstrate the public benefit of demolishing the Sears building based on Campbell Soup's decision to proceed without its demolition. As explained above, the Rules required the HSC to consider the public benefits of the proposed undertaking, which, in this case, were considerable. The Rules do not require the HSC to consider the public benefits of the "encroachment." N.J.A.C. 7:4-7.2(e)6. Moreover, while the parties acknowledged in the amended PDA of March 2008 that the Sears building might not be demolished, they agreed that its continued presence might "impede the ability of [Campbell Soup] in achieving the original goals with respect to the Sears redevelopment and the surrounding area."

B. Feasible and Prudent Alternatives

Appellants next contend that the CRA failed to establish that there were no feasible or prudent alternatives to demolishing the Sears building. They argue that the CRA did not consider all possible alternatives, that it considered only the building's reuse as Class A office space, and that it failed to adequately consider their own investment in the building's rehabilitation. They further argue that the DEP's decision to ignore the well-reasoned recommendation of the HSC to deny the application was arbitrary, capricious, unreasonable and contrary to the facts presented. We disagree.
In reaching her decision, Assistant Commissioner Cradic relied on the alternatives analysis and its cost estimates. She found that:
Each alternative, providing for a maximum of 175,000 square feet of habitable and marketable space, retained the same level and cost factors for the architectural finishes for a new building versus the rehabilitation of the existing building. Except for Alternative 2, which calls for demolition of the existing Sears Building, significant financing gaps render all other alternatives infeasible.
*955 Based on the CRA's assertion that the cost of rehabilitation was not a feasible financial alternative in meeting its project goals, Cradic concluded that alternative two (demolition) was the more prudent and feasible alternative. There is substantial credible evidence in the record supporting Cradic's decision. In addition to the alternatives analysis and economic feasibility reports, testimony at the hearing established that there were no other viable alternatives to demolition.
Finally, appellants argue that the CRA and Campbell Soup did not consider alternatives to demolition, as evidenced by language in the PDA that the building was an impediment to the project. They cite Hartling's testimony that the alternatives only considered the building's use for Class A office space, and his estimate that the structure could be rehabilitated for warehouse use for as little as $6 million. They also argue that the DEP disregarded Zaken's testimony that renovations could occur for $1 million for interior remodeling and $200,000 for roof replacement, and that sufficient funds existed for the renovations. Appellants, however, provided no evidence supporting their cost projections or their representations about "mega investors from all over the world." While appellants claim in their merits brief to have invested in excess of $200,000 for remediation of the mold, including partial interior demolition and installation of a new roof, they make no mention of their plans to invest more money in the building's rehabilitation.
Based on our careful review of the record, we are satisfied that the DEP's decision was consistent with the language and purpose of the Historic Places Act and the Rules. The DEP considered all alternatives and reasonably determined that demolition of the Sears building was the more prudent and feasible alternative. Because its decision was fully supported by the record, we will not disturb it.
Affirmed.
NOTES
[1] The property is designated as Block 1463, Lot 1 on the City's tax map.
[2] Although the particular relationship between appellants is unclear from the record, they apparently shared business interests. In 2003, they moved into Camden and began operating businesses specializing in the manufacturing and distribution of "urban life-style hip-hop" clothing.
[3] The National Register also listed the building's rear parking lot, noting its significance as the first one constructed in Camden for a "singular and specific retail establishment."
[4] Hartling described Class A as the "best space," meaning "very well maintained space, full service, good elevators, reliable heating and cooling systems, you know, modern space, good layout."
[5] Standard Merchandising Co. v. Camden City Planning Bd., Docket No. CAM-L-3449-07.
[6] The parties cite to N.J.A.C. 7:4-7.2(e)(4), as did we in Beattystown, supra, 313 N.J.Super. at 242, 712 A.2d 1170. However, N.J.A.C. 7:4-7.2 was amended effective September 2, 2008, and N.J.A.C. 7:4-7.2(e) was rewritten.