**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2658-17T2

IN THE MATTER OF
HUNTERDON COUNTY,
BOROUGH OF FLEMINGTON,
SALE OF 90-96 MAIN STREET
& ADJACENT PARKING LOTS
(BLOCK 22, LOTS 7, 8, 9 & 10)
APPLICATION FOR PROJECT
AUTHORIZATION.

_____

Argued October 7, 2019 – Decided February 24, 2020

Before Judges Fasciale, Rothstadt and Moynihan.

On appeal from the New Jersey Department of Environmental Protection.

Erin Elizabeth Simone argued the cause for appellant Friends of Historic Flemington, LLC (Maley Givens, PC, attorneys; Maurice Maley and Erin Elizabeth Simone, on the briefs).

Janine Gail Bauer argued the cause for respondent Flemington Center Urban Renewal, LLC (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Maraziti Falcon, LLP, attorneys for respondent Borough of Flemington; Janine Gail Bauer, and Robert Beckelman, on the joint brief).

John Paul Kuehne, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; John P Kuehne, on the brief).

PER CURIAM

Appellant Friends of Historic Flemington, LLC (Friends), describes itself as an "advocacy group comprised of citizens, professionals and business and property owners concerned with historic preservation in the [Borough] of Flemington." In this appeal, Friends challenges a final decision of the New Jersey Department of Environmental Protection (DEP) approving the Borough of Flemington's sale of a historic building to a private developer as part of a municipal redevelopment plan under the New Jersey Register of Historic Places Act (HPA), N.J.S.A. 13:1B-15.128 to -15.132. On appeal, Friends argues that the DEP's action was procedurally defective and not supported by sufficient evidence. It also argues that the DEP should have exercised jurisdiction over the redeveloper's entire project, which involved privately-owned properties. We affirm, as we conclude Friends has failed to meet its burden to prove the DEP's decision was arbitrary, capricious or unreasonable, or otherwise defective.

I.

Friends' challenge arose from Flemington's May 23, 2017 application to the DEP's Historic Preservation Office (HPO) to approve its sale of publicly owned historic property. The DEP established the HPO, see N.J.A.C. 7:4-1.1, under the New Jersey Register of Historic Places Rules (HPRs), N.J.A.C. 7:4-1.1 to -8.9, to administer aspects of the HPA. Flemington's application sought approval to sell a historic bank building (Bank) to a private developer, Flemington Center Urban Renewal, LLC (Flemington Center), as part of Flemington's agreement with Flemington Center for the redevelopment of Flemington's downtown area. Flemington Center cooperated with the Borough in the preparation of the application.

The Property

Flemington owns the Bank, which is part of a three-story brick and stone structure located in Flemington's Historic District (District). Built in 1870, the Bank is listed in the State and National Registers of Historic Places. The Bank's façade was modified in the 1920s to include a stone façade addition to the first floor.

The north and front of the building contains the Bank and is categorized under Flemington's Master Plan as a "contributing property" to the District. The portions located to the south and rear, are used for police offices and are

3

categorized as "non-contributing" to the Historic District. The building is surrounded by several parking lots, also owned by Flemington, for public use.

The District was registered with the State and National Registers of Historic Places in 1980 and encompasses the downtown commercial area and surrounding residences. Its buildings' architecture is considered its main historic asset. While the District covers approximately sixty percent of Flemington's area, it has been in economic decline for decades and has been marred by failed development projects and vacant buildings.

<u>Redevelopment Efforts</u>

Flemington's attempt to redevelop the District began in 2010 with the Union Hotel, a privately-owned, dilapidated historic building, that has been vacant since 2008. After determining that the building qualified as needing redevelopment under state law, Flemington adopted a resolution designating the Union Hotel as an area in need of redevelopment and adopted the Union Hotel Redevelopment Plan (2010 Redevelopment Plan). In 2012, Flemington issued a request for development proposals for the Union Hotel property. Although two developers were designated to implement the Union Hotel redevelopment project, financial concerns prevented the anticipated development.

A-2658-17T2

In 2013, Flemington began evaluating a larger redevelopment plan for the area, and as part of that plan, it directed its Planning Board (Board) to conduct a study of buildings south of the Union Hotel, including the Bank and surrounding parking lots. After considering an "Area in Need of Redevelopment Study," prepared on the Board's behalf, the Board adopted the study's findings on December 16, 2013, following a public hearing.

The study found that the expanded area qualified as an area in need of redevelopment. The Bank was recognized as "significant" to Flemington's Historic District, but the study concluded that the building was "substandard, unsafe, unsanitary, dilapidated and obsolescent." It "[had] been unoccupied for some time," and required "substantial upgrades to plumbing, electrical, fire safety and adequate means of ingress and egress to meet current building codes."

In pursuit of the expanded plan recommended by the study, in 2014, Flemington and the Board considered a report prepared at the request of the Flemington Business Improvement District, a non-profit district management corporation that manages the Flemington Special Improvement District, which includes the Main Street area. The report, entitled "Downtown Strategic Plan Report Flemington, New Jersey" (2014 Strategic Plan), recommended redevelopment of a larger portion of downtown Flemington, and described the

 A-2658-17T2

Main Street area, including the Union Hotel and the Bank, as the "heart and soul" of the plan. It recommended a mixed-use hospitality, retail, and residential development "at a density that will maintain the character of Main Street," create a residential character for surrounding streets, and "locat[e] parking resources out of view." It called for the construction of 141 residential units and 19,500 square feet of commercial space in the Main Street area.

Thereafter, the firm that authored the 2010 Redevelopment Plan prepared an "Amendment to Redevelopment Plan for the Union Hotel: Expanded Union Hotel Redevelopment Area." (2014 Redevelopment Plan). The purpose of the amended plan was to encourage redevelopment of the expanded area that "[i]s compatible with and enhances the historic character of the Union Hotel and Historic District," "[a]ttracts new visitors and residents" to Flemington, "[s]upports the existing businesses and other uses," and "is cohesive with adjacent residential uses."

In August 2015, Flemington adopted a "Reexamination of the Master Plan" report (2015 Master Plan). It maintained the goals and objectives set forth in the previously adopted 2010 Master Plan, but updated it to add elements related to the economic revitalization of Flemington's downtown area,

recommend concentrated retail, service, and entertainment uses, and identify the "[e]xpanded Union Hotel" area as in need of redevelopment.

The Redevelopment Agreement

In February 2016, Flemington adopted a resolution designating John J. Cust, Jr., the sole member of Flemington Center, as the redeveloper for the downtown area. On March 13, 2017, Flemington adopted a new resolution designating Flemington Center as the "redeveloper for the Redevelopment Area." It then entered into a redevelopment agreement with Flemington Center.

The agreement included the Bank, the Union Hotel and other properties not owned by Flemington as part of the redevelopment area,[1] and it required the project to conform with an attached "Concept Plan" and the 2014 Redevelopment Plan, with the latter controlling should any conflicts arise. The project's purpose was to revitalize downtown Flemington to "compete within the marketplace to attract people who will want to live, work and visit Flemington" by "creat[ing] a vibrant and [d]ynamic [m]ixed-[u]se, [l]ifestyle [c]ommunity

---

[1] It also identified several "Additional Propert[ies]" to add to the project as part of an "Expanded Redevelopment Area," which are not relevant to the current appeal. Counsel for appellant represents that appellant is challenging the designation of those properties in separate litigation.

that will be attractive to [the] local [c]ommunity, while promoting [t]ourism and [h]igher [e]ducation."

Flemington Center's proposal was larger in scope than the 2014 Strategic Plan recommendations. The project called for the construction of approximately 222 residential units, a 100-room hotel, a 45,000 square foot educational and medical office building, 32,250 square feet of retail space, 4,800 square feet of amenities, and 820 parking spaces. Notably, as originally stated, the proposal did not retain the façades of the Bank or Union Hotel.

Pursuant to the agreement, Flemington Center was required to acquire title from Flemington to all the properties within the redevelopment area using private funding. That acquisition prompted Flemington's May 23, 2017 application to the DEP's HPO.

The HPO Application

According to Flemington's application, the redevelopment would preserve the historic façade of the Bank and remodel its interior to include 4,200 square feet of retail space and eight residential units. It also called for the removal of the stone first floor façade that was added in the early twentieth century, the restoration of the building's brick exterior, and the replacement of the building's windows. Additionally, the project contemplated the complete removal of the

8

"non-contributing" additions, and for the construction, and attachment, of a seven-story building to the building's east side.

Renditions of the complete project depicted the Bank's façade facing Main Street, albeit no longer an independent building. Additional stories would be constructed onto the Bank and surrounding lots but would be set back behind the façade. Regarding the Union Hotel, the proposal involved constructing two stories on top of the existing Union Hotel, such that its historic façade would no longer cover the entire front of the building.

The application included a brief "structural assessment" of the Bank, noting the façade of the Bank would be preserved, its interior would be redeveloped, and that the non-contributing portions of the building would be demolished. A full structural assessment was not performed "[g]iven the limited nature of the demolition proposed."

The application also included an "alternatives analysis" prepared by a historic preservation consulting firm. The alternatives analysis described the following public benefits to be derived from the proposed redevelopment: rehabilitating the exterior of the Union Hotel and the Bank, creating "much needed" public parking, improving the water supply system, creating modern retail stores, increasing the residential population, and increasing the number of

visitors. It also noted that Hunterdon County is the only county within New Jersey that lacks any form of higher education, and the project sought to remedy that by including educational facilities.

The application contained an analysis of four alternatives to the sale of the Bank to Flemington Center. Alternative I was to develop nothing in the redevelopment area—the "No Build" proposal. Without development, the "entire Historic District [would] continue to be plagued by vacancies, disrepair and underutilization."

Alternative II—the "reduced" build proposal—would reduce the scope of the project such that no redevelopment would occur for the Bank. The number of residential units involved in the project would be reduced from 248 to 83 and the retail/restaurant space would be reduced from 48,900 square feet to 12,300 square feet. The result would be a reduction in tax benefits to Flemington by forty-four percent. Further, it might require the developer to demolish other buildings to maximize space.

Alternative III was "Full Build," meaning the redeveloper, after acquiring the properties, would remove the existing buildings and redevelop from the ground up. A full build would not "address the desire of the community to preserve the historic structures."

Alternative IV, termed the "Adaptive Reuse" proposal, was Flemington Center's proposed project. This proposal would allow Flemington "to produce a highly integrated and highly marketable and attractive design that will achieve the goals of the Redevelopment Plan and Master Plan without adverse effects to the existing historic infrastructure on and surrounding Main Street." This alternative was therefore preferred by the consulting firm.

The Supplement to the Application

After receiving Flemington's application, on June 6, 2017, the HPO responded in a letter indicating that the application was incomplete and requesting additional information. Flemington responded with a supplement to the application on July 10, 2017. In that submission, Flemington limited its response to the Bank only, arguing that the HPO was constrained from reviewing the greater redevelopment project. It provided detail regarding the project's physical effects on the Bank, explaining that while the non-contributing police addition and the interior of the Bank were to be removed, the exterior elements of the building would be restored and preserved to retain the historic façade. Flemington also provided information about the planned uses for the redeveloped Bank, describing that the ground floor would be repurposed for

11

retail use, and that residential units would be constructed on the second and third floors.

Flemington also supplied the HPO with a July 7, 2017 economic impact analysis, a copy of the historic preservation element of the Master Plan, a "parking analysis" from an engineering firm, and responses to both the public's and the HPO's questions.

With respect to the impact of demolition and construction, Flemington attached a letter from an engineering firm that described the specific procedures involved in integrating the Bank's façade into the new building. Flemington also explained the police building could be removed without impacting the Bank's structural integrity, blasting would not be required for the adjacent construction, and vibration monitoring would be employed.

In response to the HPO's request for an analysis of alternatives for the proposed project, Flemington provided cost estimates comparing the costs of the reduced build, full build, and proposed development alternatives. It represented that the reduced build would have a total project cost of $54,269,954, the full build would cost $91,329,417, without any rehabilitation of the Bank and Union Hotel, and Flemington Center's proposal would cost $92,173,079, with preservation of both building façades.

Flemington also responded to the HPO's various questions regarding other alternatives. In particular, the HPO asked Flemington to consider an adaptive reuse alternative using the federal Standards for Rehabilitation, under 36 C.F.R. § 67.7, which could qualify certain certified historic structure redevelopments for federal tax credits, under 26 U.S.C. §§ 46(1), 47.[2] In response, Flemington described how a project under the federal standards could be developed, but stated that it would not be financially feasible and would conflict with its development interests. It also attached a letter from a certified public accountant that stated the Bank and Union Hotel rehabilitations were too small for rehabilitation tax credits under federal law.

Flemington also addressed other alternatives suggested by the HPO. Regarding the HPO's inquiry about selling the property to a third party with restrictions or conditions to preserve the exterior of the bank building, Flemington noted that its proposed sale to Flemington Center included such restrictions. In response to the HPO's inquiry about Flemington increasing the size of the redevelopment area to enable the project objectives while adaptively reusing existing buildings, Flemington indicated that expanding the

---

[2] This alternative was referred to as "Alternative V" in subsequent communications.

redevelopment area "[was] not a viable strategy to meet the project objectives primarily because of ownership and use constraints." According to Flemington, the other surrounding properties were single-family homes not available for redevelopment. Finally, Flemington responded to the HPO's inquiry about selling the Bank with a preservation easement to keep development in scale with the District, by explaining that it would not be economically viable. However, Flemington stated it would be willing to grant a façade easement on the Bank as a condition of approval.

After considering Flemington's supplemental application, in July 2017, the HPO informed Flemington that its application for approval was deemed technically and professionally complete, and that the HPO would add the application to the agenda for the August 16, 2017 meeting of the Historic Sites Council (HSC).[3] Just prior to that meeting, on August 14, 2017, Friends submitted a letter opposing the application. That letter was one of several that Friends sent to the HPO objecting to the proposal and requesting that the HPO

---

[3] The HSC is an advisory body consisting of eleven members appointed by the Governor with the advice and consent of the Senate. N.J.S.A. 13:1B-15.108. It has the power to "consult with and advise the [DEP] commissioner and the director" with respect to historic sites, N.J.S.A. 13:1B-15.110, and provides written recommendations to the Commissioner regarding applications to approve public encroachments upon registered property, N.J.A.C. 7:4-7.2(e).

extend its jurisdiction beyond the sale of the Bank to the greater redevelopment project.

### HSC Consideration of Application

At the HSC meeting, an HPO staff member summarized the application and recommended denial. Following the HPO's presentation, Flemington's mayor testified about the Borough's economic difficulties since 2008 and argued that the proposal would "reverse the decline," as several other attempts to redevelop the area failed for financial reasons. An architect retained by Flemington Center testified and provided details about the project. Cust and other representatives of Flemington Center also testified in support of the application, as did representatives from the Hunterdon Medical Center, the Hunterdon County Board of Chosen Freeholders, and the Hunterdon County Chamber of Commerce.

During the public comment portion of the meeting, several local residents and business owners spoke in favor of the proposal. In addition to several representatives of Friends, other individuals also testified against the project, including a licensed professional planner, representatives from a historic preservation consultant, and other interested members of the public.

A-2658-17T2

Following deliberations, the HSC recommended temporarily denying the application and requesting additional information from Flemington.

The DEP's Response to the HSC

On September 5, 2017, the DEP followed the HSC's recommendations, temporarily denied Flemington's application, and requested supplemental information. The additional information included a condition assessment of the interior and exterior of the Bank by an architect and engineer to determine whether the building could be rehabilitated in accordance with the federal standards, an archaeological survey, and an "evaluation of the appropriateness of scale of the proposed new development of [the Bank] in the context of the surrounding Flemington Historic District." The DEP indicated that a final determination would be made within sixty days after receipt of the requested information.

The DEP's request prompted an ongoing exchange of requests for clarification and responses between Flemington, the DEP, the HPO, and the HSC. On October 30, 2017, Flemington asked for clarification regarding the HPO's request for an evaluation of the appropriateness of the scale of the project and, in its November 1, 2017 response, the HPO explained that it only required

a description of the scale of the development relating to the Bank itself and the adjacent lots.

On November 3, 2017, Flemington provided the requested structural analysis report prepared by a licensed engineer, a conditions assessment prepared by an architect, the Phase I archaeological survey, a report prepared by Flemington Center regarding the size, scale, and density of the project, and a report about the appropriateness of the scale of the proposed development.

On November 16, 2017, the HPO requested that the HSC appoint a subcommittee to review the additional documents and provide a recommendation. On November 25, 2017, Friends submitted a letter to the HPO challenging Flemington's November 3, 2017 submission as inadequate.

The subcommittee found that the condition assessment and structural analysis did not adequately compare the proposed redevelopment to one under the federal standards. It made no comment, however, about the archeological report and, regarding the evaluation of the "appropriateness of scale," the subcommittee believed that the evaluation lacked information as to the necessity of the project's seven-story size. The subcommittee did not make any recommendation to the DEP regarding the outcome of the application.

 A-2658-17T2

In order to address the subcommittee's new concerns, HPO staff met with Flemington's representatives to discuss the submission of additional information. Flemington then provided the HPO with its December 12, 2017 amended redevelopment agreement with Flemington Center, which incorporated the preservation of the Bank and Union Hotel façades as part of the concept plan. It also supplied additional information about the conditions assessment and structural analysis, explaining that rehabilitating the Bank in accordance with the federal standards (Alternative V) would result in forty-six fewer residential units. For the project to be viable under Alternative V, the developer would then need to replace the Union Hotel. Regarding the appropriateness of scale, Flemington explained that the height of the Bank increases from three to seven stories as it moves away from Main Street to minimize the visual impact of the taller portions, and that the redeveloper would use design features to visually "break up" the building mass.

The increased scale was necessary, according to the redeveloper, to render the project viable in light of substantial costs for items such as improving Flemington's sewer system and providing public parking. According to the supplemental submission, Flemington Center "agreed to absorb these additional costs in exchange for more density, scale and height."

As to the suggestion that required limiting the height of buildings to four stories, the redevelopment would then include eighty-one fewer dwelling units, fifty-one fewer hotel rooms, and would prevent Flemington Center from obtaining a liquor license for the hotel.[4] According to its financial analysis, this alternative (Alternative VI) would result in a smaller tax revenue increase, and preclude the ability to raise capital or secure financing, because it would yield a return on investment (ROI) of 3.60%, whereas Alternative IV had an ROI of 8.61%. Flemington Center estimated that, under Alternative VI, the total project costs would be greater than the overall value upon completion, meaning the proposal was not viable.

Final Decision

On January 2, 2018, the DEP issued its final decision approving the sale subject to several conditions after finding, in light of the supplemental materials, that the application satisfied the governing criteria for sale approval. In reaching its decision, the DEP considered the public benefit of the project, the existence

---

[4] According to the December 2017 redevelopment agreement, the redeveloper "may secure a liquor license in connection with the construction of the hotel with at least one hundred (100) rooms." The agreement notes that the redeveloper has already obtained another liquor license within Flemington and requires that license to be used for the hotel if the redeveloper cannot obtain another liquor license.

of feasible and prudent alternatives, and measures to mitigate the impact of the development on the property. The public benefit of the proposal included the attraction of new residents and businesses to the community, substantial infrastructure improvements that Flemington Center agreed to make, and the increased tax revenues. It concluded that of the alternatives presented, Flemington's proposal was "the more prudent and feasible alternative." Accordingly, it authorized the sale, but imposed twenty-one detailed "mitigating conditions."[5]

After the DEP issued its decision, Friends wrote to the DEP asking it to reconsider and reverse the decision. The DEP declined to reconsider, and Friends filed this appeal. Afterward, Flemington accepted all the DEP's conditions to its approval of the sale.

---

[5] One condition required Flemington Center to "retain all of the [façade] of the [Bank] and the front and side [façades] of the Union Hotel." Another condition required it to stabilize and brace the front and side façades of the Bank and Union Hotel, and to rehabilitate them in accordance with the federal standards. The DEP also required existing windows to be repaired, not replaced. If replacements were necessary due to irremediable deterioration, Flemington Center was to replace windows with windows of the same appearance, size, design, proportions, and profiles, all with the HPO's approval. The HPO also imposed twelve conditions regarding archaeological tests and surveys, three conditions regarding architectural documentation, conditions regarding streetscape improvements and interpretive signage, and a condition requiring a contribution from the developer to the Preservation Grant Fund.

## II.

### A.

We begin our review of the DEP's final administrative agency decision by acknowledging that it is limited. In re Herrmann, 192 N.J. 19, 27 (2007). "We will not reverse an agency's decision unless it is arbitrary, capricious, or unreasonable, or lacks fair support in the record." In re Project Authorization Under N.J. Register of Historic Places Act, 408 N.J. Super. 540, 558 (App. Div. 2009). In our review, we "determine whether the agency decision violates legislative policies, lacks the support of substantial evidence in the record, and unreasonably applies legislative policies to the relevant facts." Id. at 559. If the agency's decision is not otherwise arbitrary, capricious, or unreasonable, or lacks fair support in the record, "we owe substantial deference to its expertise and superior knowledge in a particular field, and to its interpretation of its own regulations." Ibid.

### B.

Applying our deferential standard, we turn first to Friends' contention that the DEP should have denied Flemington's application because of procedural defects. First, Friends argues that Flemington's initial response to the temporary denial was "incomplete" under the applicable regulations, and that any

subsequent submissions were untimely and should have been rejected. Second, it claims that the DEP's approval failed to set forth reasons for deviating from what Friends claims were the HSC subcommittee's recommendations. We find these contentions to be without merit.

According to Friends, Flemington's response to the HSC failed to comply with N.J.A.C. 7:4-7.2(e)(9)(iii), a regulation promulgated by the DEP under the HPA. The regulation states if the DEP issues a temporary denial due to a "need for additional information, exploration of additional alternatives for avoidance or mitigation of the encroachment, damage, destruction or other adverse effects," the DEP "shall deny the application" if "the applicant[t] [fails to] respond . . . within [sixty] days from the date of issuance of a temporary denial." N.J.A.C. 7:4-7.2(e)(9)(iii). Friends argues that the regulatory language includes an "[i]mplicit" requirement "that if an incomplete response is made, the denial shall stand." In its view, Flemington's November 3, 2017 submission was "incomplete" because it did not contain an adequate condition assessment or a sufficient justification for the scale of the project. Friends also argues that any information submitted after November 3, 2017, was "untimely." Friends finds further support in the regulation's language that states: "[i]f the applicant submits a complete response including all information requested by the [DEP],

it shall be within the discretion of the [DEP] as to refer additional information to the [HSC], and the [DEP] shall make a final determination within [sixty] days after receipt of the response." N.J.A.C. 7:4-7.2(e)(9)(iii). We disagree.

Here, the DEP issued its temporary denial on September 5, 2017. Flemington responded with supplemental information on November 3, 2017, within the sixty-day period allotted by the regulations. After the HSC subcommittee reviewed Flemington's submission, and following a meeting with HPO staff, Flemington submitted additional information in December 2017. Although that second submission was beyond sixty days of the temporary denial, it was in response to a request for clarification and additional information. The plain language of the regulation only compels denial when no response has been made. Here, Flemington not only submitted a timely response, but it followed up with additional information the DEP needed to reach its final determination. Based on these facts, we have no cause to disturb the agency's decision.

C.

Next, Friends contends that the DEP failed to "provide[] an adequate explanation" for not following the HSC subcommittee's recommendation to deny the application after it considered Flemington's November 3, 2017 submission. For that reason, Friends argues we should not defer to the DEP's

final decision because there is no basis for this court to have the requisite "confidence that there has been a careful consideration of the facts in issue and appropriate findings addressing the critical issues in dispute." Bailey v. Bd. of Review, 339 N.J. Super. 29, 33 (App. Div. 2001). We conclude that this contention is without merit as its premise is flawed.

Friends cites nothing from the record suggesting that the HSC subcommittee ever recommended permanent denial of Flemington's application. The subcommittee's two-page document stating its observations about Flemington's November 3, 2017 submission does not contain a recommendation to reject the application, although it did find certain deficiencies that Flemington addressed in its December 2017 submission. Although it is unclear from the record whether the subcommittee even reviewed the later submission, there is nothing to indicate that the DEP based its approval on anything less than all of the information submitted. Based on that review, the DEP presented detailed reasons explaining why it believed its approval was appropriate. Moreover, and contrary to Friends' additional argument, there was no reason for the DEP to provide an explanation for allowing untimely submissions by Flemington because, as already noted, there were none.

D.

We turn our attention to Friends' argument that the DEP's decision was arbitrary, unreasonable, and capricious, not supported by the record, and contrary to the HPA. According to Friends, the DEP based its decision upon inadequate information it received from Flemington in response to numerous requests for additional information during the process. Also, Friends believes it would have been better for the community had the DEP required Flemington to pursue one of the other alternatives it considered or required more from Flemington as a condition to the DEP's approval. It also claims that the DEP's approval conflicts with the purposes of the HPA because several preservation groups opposed the application and it is contrary to the HPA "to approve a project where reasonable and feasible alternatives exist but remain unexplored."

We reject Friends' contention that Flemington acted arbitrarily or capriciously as we conclude the DEP properly exercised its authority by honestly considering the evidence before it and choosing a reasonable alternative relating to the protection of historical sites, as contemplated by the HPA.

"[A] determination predicated on unsupported findings is the essence of arbitrary and capricious action." In re Certificate of Need of the Visiting Nurse Ass'n of Sussex Cty., 302 N.J. Super. 85, 95 (App. Div. 1997) (quoting In re

Application of Boardwalk Regency Corp. for Casino License, 180 N.J. Super. 324, 334 (App. Div. 1981), modified, 90 N.J. 361 (1982)).  The judicial inquiry into whether an administrative agency action was arbitrary or capricious

> is restricted to three inquiries:  (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 & 10:85-4.1, 117 N.J. 311, 325 (1989).]

As long as an agency's action is not arbitrary and capricious, and is statutorily authorized, we may not substitute our judgment for the agency's, In re Adopted Amendments to N.J.A.C. 7:7A-2.4, 365 N.J. Super. 255, 264 (App. Div. 2003), even if we would have chosen a different course of action, Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988); Sussex Cty., 302 N.J. Super. at 95.

Moreover, "[a] strong presumption of reasonableness" must be accorded to an agency's statutorily authorized actions, which presumption is "even stronger [when] the agency has [then] delegated discretion to determine the specialized and technical procedures for its tasks."  City of Newark v. Nat. Res.

26

Council, Dep't of Envtl. Prot., 82 N.J. 530, 539-40 (1980); Sussex Cty., 302 N.J. Super. at 95. If there are two possible courses of action, "an administrative decision will not be deemed arbitrary and capricious if exercised honestly and the course ultimately chosen is a reasonable one." Sussex Cty., 302 N.J. Super. at 95.

Applying these guiding principles, we find Friends' contentions about the DEP's final decision being arbitrary, capricious, unreasonable, or unsupported by the evidence to be without sufficient merit to warrant discussion in a written opinion as the decision was supported by sufficient credible evidence in the record. R. 2:11-3(e)(1)(D). Suffice it to say, as the Court has observed:

> If a subject is debatable, the agency determination must be upheld. Quite obviously, if we were to decide the underlying merits, we would thereby perform the administrative function itself. Upon that approach the court would become the legislative body. The judiciary can interfere with such a determination only when it is plainly demonstrated to be arbitrary. The most that here is revealed is that men can earnestly disagree. This being so, the [agency] alone bears the responsibility for decision. It is not for the judiciary to agree or disagree.
>
> [Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot., 423 N.J. Super. 549, 559 (App. Div. 2011) (quoting United Hunters Ass'n of N.J., Inc. v. Adams, 36 N.J. 288, 292 (1962)).]

27

For that reason, "[w]e will affirm an agency decision if we find that the evidence and the inferences to be drawn therefrom support the decision, even if <u>we</u> would have reached a different result," let alone an appellant. <u>Id.</u> at 560 (emphasis added).

Further, we need not consider Friends' contention, that the DEP's decision was inconsistent with the purposes of the HPA, as Friends has not offered any factual or legal support for that contention. "Where an issue is based on mere conclusory statements by the brief writer, we will not consider it." <u>Nextel of N.Y., Inc. v. Borough of Englewood Cliffs Bd. of Adjustment</u>, 361 N.J. Super. 22, 45 (App. Div. 2003).

E.

Friends' final argument is that the DEP failed to satisfy its obligation to exercise its jurisdiction over the entire redevelopment of Flemington, not just the Bank and public parking lots, because Flemington's redevelopment agreement with Flemington Center was an "undertaking" within the meaning of the HPA. While Friends recognizes that an "undertaking" does not include a development project on privately owned land, it argues, contrary to the DEP's

28

interpretation of its own regulation,[6] that the redevelopment agreement was "an agreement or other form of permission allowing use of a registered property" within the meaning of N.J.A.C. 7:4-1.3, and therefore the entire redevelopment project required DEP approval. We find this contention to be unsupported by the applicable law.

"In interpreting a regulation, [we] give deference to the views of the administrative agency that implements the determinations." In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013); see also Lasky v. Borough of Hightstown, 426 N.J. Super. 68, 73-74 (App. Div. 2012) ("'[A]n agency's interpretation of its own regulations is entitled to substantial deference[,]' when it does not 'flout the statutory language and undermine the intent of the Legislature.'" (second alteration in original) (citations omitted) (first quoting I.L. v. Dep't of Human Servs., 389 N.J. Super. 354, 364-65 (App. Div. 2006); and then quoting GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 306-07 (1993))).

---

[6] Although the DEP's final decision did not analyze this issue, the HSC's resolution following its meeting acknowledged the limited scope of the DEP's jurisdiction when it stated: "Of the [fourteen] properties included in the redevelopment agreement, the scope of this Council's review pertains only to those owned by . . . Flemington (the Bank Building and the parking lots . . .) and the direct or indirect effects of their sale on the larger . . . District."

Affording the DEP our substantial deference, we conclude that its interpretation of its regulation is reasonable and consistent with the enabling statute. N.J.A.C. 7:4-1.3 distinguishes between actions taken by a municipality with respect to its own property or property it is in the process of acquiring, which may constitute an undertaking, and administrative functions involving government supervision over the use of private property, which do not qualify as undertakings. That distinction is consistent with the HPA, which expressly limits its applicability to projects undertaken by a public entity, without referring to projects undertaken by a private entity relating to privately owned property. N.J.S.A. 13:1B-15.131.

N.J.A.C. 7:4-1.3 illustrates the "actions" that constitute public undertakings by including the following: "acquisitions, sales, leases, transfers of deed, easements, an agreement or other form of permission allowing use of a registered property, cyclic maintenance, and alterations or relocation of a registered property." All of these actions involve public ownership of the registered property at issue. There is no support in this regulatory language for Friends' contention that the regulation's reference to an "agreement or other form of permission" is not limited to public ownership or interest in the subject property.

The regulation expressly identifies those municipal actions that are not considered undertakings to include "(1) [c]hanges in local zoning ordinances; (2) [i]ssuance of building or demolition permits to private individuals or corporations; (3) [g]ranting of zoning variances to private individuals or corporations; and (4) [h]ousekeeping and routine maintenance." N.J.A.C. 7:4-1.3; see also Hoboken Env't Comm., Inc. v. German Seaman's Mission of N.Y., 161 N.J. Super. 256, 270-71 (Ch. Div. 1978) (deferring to the DEP's interpretation of "undertake any project" to require "active participation" by a municipality and to exclude any administrative functions such as the issuance of a demolition permit).

Here, then, there is no reason for the DEP to assume jurisdiction over the entire redevelopment project. As between Flemington and Flemington Center, the agreement only addresses the sale of public property that is contingent upon Flemington Center acquiring title to other privately owned property and then pursuing any necessary municipal approvals under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163,[7] which involves municipal actions that are not considered "undertakings."

---

[7] The MLUL requires municipalities to refer all applications for permits relating to historic sites to the local historic preservation commission. N.J.S.A. 40:55D-

Contrary to Friends' perception, the agreement did not create a partnership between Flemington and Flemington Center that involved the municipality acquiring or developing any property, public or private. Similarly, we reject Friends' contention that under the LRHL, the redevelopment agreement here required Flemington to be "responsible for implementing redevelopment plans and carrying out redevelopment projects." N.J.S.A. 40A:12A-4(c). Under the LRHL, Flemington would only be responsible for carrying out the project if it engaged in "any work or undertaking pursuant to a redevelopment plan," which may include:

> [A]ny buildings, land, including demolition, clearance or removal of buildings from land, equipment, facilities, or other real or personal properties which are necessary, convenient, or desirable appurtenances, such as but not limited to streets, sewers, utilities, parks, site preparation, landscaping, and administrative, community, health, recreational, educational, and welfare facilities.
>
> [N.J.S.A. 40A:12A-3.]

---

111. Under Friends' interpretation, if the resolution of such a permit involves any cooperation or support between the municipality and an applicant, DEP approval under the HPA would be required. However, neither the HPA, the MLUL, nor the Local Redevelopment and Housing Law (LRHL), N.J.S.A. 40A:12A-1 to -73, declares that DEP has a role in such matters. If we were to accept Friends' interpretation, we would expand the DEP's authority beyond the scope of the statutes and implementing regulations.

A-2658-17T2

While a municipality may delegate such tasks to a private developer, see N.J.S.A. 40A:12A-8(f), it doing so does not establish an "undertaking" under the HPA. The statutes do not cross-reference each other and nothing in the language of either act calls for such an interpretation. As previously discussed, the HPA is expressly limited to government "action" and the regulations expressly exclude administrative, supervisory functions over land use from that definition.[8] To hold otherwise would require the DEP to review all redevelopment agreements that affect, directly or indirectly, a registered property.

We also find no merit to Friends' contention that the DEP should have assumed jurisdiction over the entire project under the Long Term Tax Exemption Law (LTTEL), N.J.S.A. 40A:20-1 to -22. According to Friends, when Flemington entered into a financial agreement with Flemington Center,[9] it

---

[8] Notably, the LRHL was enacted twenty-two years after the HPA but does not reference or amend the HPA provisions at issue here. L. 1970, c. 268, § 1 (HPA); L. 1992, c. 79, § 1 (LRHL). As originally enacted, the HPA could not have intended to include redevelopment agreements as defined by the LRHL as public undertakings, because the LRHL did not yet exist.

[9] Friends raises the existence of this financial agreement, entered into after the agency's final decision, for the first time in its reply brief, as its merits brief merely states Flemington "intend[ed] to enter into a financial agreement" with Flemington Center. We will not, however, consider an issue not presented in a

was required by the LTTEL to "retain all necessary authority and control for the redevelopment of the redevelopment area," and that the private redevelopment project had to be "deemed a delegation of the powers of the municipality to undertake the project." N.J.S.A. 40A:20-4. Given that the DEP approved the sale of the property in January 2018, and this financial agreement was approved in October 2018, to the extent Friends relies on it, we are limited to the record in front of us. "[A]ppellate review is confined to the record made [below], and appellate courts will not consider evidence submitted on appeal that was not in the record [below]." Scott v. Salerno, 297 N.J. Super. 437, 447 (App. Div. 1997) (citations omitted); see also R. 2:5-4(a). Even so, we conclude Friends' reliance upon this law is misguided.[10] A municipality may supervise redevelopment under the LRHL and the LTTEL, without engaging in an "undertaking" within the meaning of the HPA.

---

party's merits brief and shall deem it to have been waived. See Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); Drinker Biddle & Reath LLP v. N.J. Dep't of Law & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (claims not addressed in merits brief deemed abandoned, and could not properly be raised in a reply brief); see also Pressler and Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2020).

[10] Similarly to the LRHL, the LTTEL, L. 1991, c. 432, § 4, enacted twenty-one years after the HPA, does not reference or amend the HPA provisions at issue here.

In this case, the only action taken directly by Flemington was the sale of the Bank and the parking lots, registered properties it owned, to Flemington Center. This action constituted an "undertaking" under the HPA. See In re Project Authorization, 408 N.J. Super. at 546, 556-57 (holding that municipal redevelopment authority, established for the "acquisition and disposition of properties for [re]development purposes," was statutorily mandated to seek the DEP's authorization prior to its acquisition and demolition of historic property). The DEP had no jurisdiction under the HPA to review the remainder of the redevelopment, which involved private development upon private property.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2658-17T2